UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
S.S., *individually and on behalf of J.M.*,                       :
                                                                  :
                                        Plaintiffs,               :
                                                                  :           25-cv-0217 (LJL)
                   -v-                                            :
                                                                  :           OPINION AND ORDER
NEW YORK CITY DEPARTMENT OF EDUCATION,    :
                                                                  :
                                        Defendant.                :
                                                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff S.S., individually and on behalf of J.M., a child with a disability (the "Student"),

has moved for summary judgment on her claim that the New York City Department of Education

("Defendant," or "DOE") was required to fund an Independent Educational Evaluation ("IEE")

for J.M.  Defendant has cross-moved for summary judgment on its claim that the Court should

uphold the decision of the New York State Education Department's State Review Officer

("SRO") affirming the decision of the Impartial Hearing Officer ("IHO") finding that J.M. was

not entitled to a publicly-funded IEE.  For the following reasons, Plaintiff's motion for summary

judgment is granted, and Defendant's motion for summary judgment is denied.

## BACKGROUND

### I.    Statutory and Regulatory Background

Congress enacted the Individuals with Disabilities Education Act ("IDEA") with the goal

of ensuring "that all children with disabilities have available to them a free and appropriate

public education . . . designed to meet their unique needs . . . and to ensure that the rights of

children with disabilities and the parents of such children are protected."  20 U.S.C. §

1400(d)(1)(A)–(B).  "The IDEA offers federal funds to states that develop plans to assure all

children with disabilities residing in each such state a free appropriate public education." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 (2d Cir. 2012) (citations and alterations omitted). To provide a free and appropriate public education ("FAPE") to a student with disabilities, the school district must offer a special education program consisting of "specially designed instruction, at no cost to parents, to meet the unique needs of" the child, as well as related services that "may be required to assist a child with a disability to benefit from a special education." 20 U.S.C. § 1401(26), (29); *see Endrew F. ex. rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) ("A FAPE, as the Act defines it, includes both 'special education' and 'related services.'" (quoting 20 U.S.C. § 1401(9))).

"A child with a disability receives this tailored instruction and support through their individualized education program ('IEP')." *D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 157 (2d Cir. 2020). The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). "An IEP must include a statement of the child's academic achievement and functional performance, the child's academic and functional goals, how the child's disability affects their progress towards achieving those goals, how the child's progress will be measured, and the services that will be provided to help the child succeed at school." *D.S.*, 975 F.3d at 157; *see* 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III). "If parents believe that an IEP is not appropriate," they may seek an administrative hearing on the matter. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (internal citation omitted).

A child's IEP is based in significant part on the results of statutorily mandated evaluations of the child known as independent educational evaluations, or "IEEs." *See, e.g.*, 20 U.S.C. § 1414(b)(2)(A)(ii), (c)(1)–(2), (d)(3)(A), (d)(4)(A). Such a "full and individual initial evaluation" is used to determine if the child has a covered disability, the extent of their disability,

and whether the child is entitled to special education and related services under the Act. *Id.* § 1414(a)(1). The child is further entitled to a "reevaluation" at least once every three years, but no more than once a year, for the purpose of updating their IEP. *Id.* § 1414(a)(2), (d)(4)(a). The school conducting the evaluation must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information." *Id.* § 1414(b)(2)(A). It must cover "all areas of suspected disability." *Id.* § 1414(b)(3)(B). "IDEA thus ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition." *Schaffer*, 546 U.S. at 60–61; *see Alex W. v. Poudre Sch. Dist. R-1*, 94 F.4th 1176, 1193 (10th Cir. 2024) ("IEEs play a critical role in the IDEA framework.").

Federal regulations confirm that parents of children with disabilities have "the right" to "obtain an independent educational evaluation of the child," which is an evaluation "conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question" at the public's expense. 34 C.F.R. § 300.502(a). The right to an IEE arises where the "parent disagrees with the evaluation obtained by the public agency." *Id.* § 330.502(b)(1). Upon expressing a disagreement with an IEE conducted by the agency and requesting a new one, the agency may "ask for the parent's reason why," although the parent need not respond. *Id.* § 300.502(b)(4). Where the parent requests an IEE, the state agency has two options. It must either (1) "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate," or (2) "[e]nsure that an independent educational evaluation is provided at the public expense." *Id.* § 300.502(b)(2)(i)–(ii). At that hearing, the "burden automatically shifts to the school to . . . show that its evaluation is appropriate." *D.S.*, 975 F.3d

at 168 (quoting 34 C.F.R. § 300.502(b)).  If the agency pursues the due process hearing, and the

IHO determines that the agency's evaluation was correct, the parent "still has the right to an

independent educational evaluation, but not at public expense."  34 C.F.R. § 300.502(b)(3).

Otherwise, the IHO may order the DOE to fund the IEE at the public expense.  "A parent is

entitled to only one independent educational evaluation at public expense each time the public

agency conducts an evaluation with which the parent disagrees."  *Id.* § 300.502(b)(5).  If the

parent obtains a new IEE, either at their own expense or the public expense, the results "[m]ust

be considered by the public agency, if it meets agency criteria, in any decision made with respect

to the provision of FAPE to the child."  *Id.* § 300.502(c)(1).

The scope of a reevaluation is dependent, to some extent, on the content of any prior

evaluation.  New York regulations clarify that "[a] committee on special education shall arrange

for an appropriate reevaluation of each student with a disability if the school district determines

that the educational or related service needs . . . warrant a reevaluation or if the student's parent

or teacher requests a reevaluation."  8 NYCRR § 200.4(b)(4); *see* 34 C.F.R. § 300.303(a)(1); 20

U.S.C. § 1414(a)(2)(A).  Such a reevaluation shall occur "not more frequently than once a year,"

and "at least once every three years," unless the parties agree "in writing that such reevaluation is

unnecessary."  8 NYCRR § 200.4(b)(4).  The applicable regulation continues that:

> The reevaluation shall be conducted by a multidisciplinary team or group of persons, including at least one teacher or other specialist with knowledge in the area of the student's disability.  In accordance with paragraph (5) of this subdivision, the reevaluation shall be sufficient to determine the student's individual needs, educational progress and achievement, the student's ability to participate in instructional programs in regular education and the student's continuing eligibility for special education.  The results of any reevaluations must be addressed by the committee on special education in a meeting to review and, as appropriate, revise the student's IEP.

*Id.*  Paragraph five of the same regulation further explains (as relevant here) that the committee

executing any reevaluation "shall review existing evaluation data on the student," and that "[o]n

the basis of that review, and input from the student's parents and other qualified professionals . . . shall identify what additional data, if any, are needed to determine . . . whether any additions or modifications to the special education services are needed to enable the student to meet the measurable annual goals set out in the IEP." *Id.* § 200.4(b)(5)(i)–(ii).  The evaluation must be "sufficiently comprehensive to identify all of the student's special education needs." *Id.* § 200.4(b)(6)(ix); 34 C.F.R. § 300.304(c)(6).

## II.    Factual Background

J.M. was diagnosed with autism on or before February 14, 2017, when he was six years old.  R. 86.[1]  He has since been diagnosed also with attention deficit disorder and disorder of written expression.  R. 108.  According to the 2020 IEP prepared for J.M., in January 2020, J.M. received "an independent speech and language evaluation," R. 112, a "neuropsychological evaluation," R. 113, an "updated functional behavior assessment," R. 115, "[a]n independent physical therapy evaluation," R. 116, and "[a]n independent occupational therapy evaluation," R. 116.  That IEP therefore recommended that the Student receive counseling services, occupational therapy, parent counseling and training, physical therapy, speech-language therapy, and the provision of a paraprofessional for behavioral support.  R. 133–34.  This was likely not J.M.'s initial evaluation, as the record also contains evidence of an IEP implemented on June 24, 2018, that mandated a number of accommodations and services, including counseling, occupational therapy, speech-language therapy, parent counseling and training, and an accompanying crisis management paraprofessional.  R. 84.  There is also evidence in the record that J.M. previously partook in various evaluations beginning in 2016, R. 85–87, although it is not clear if these evaluations were the "initial" evaluation as contemplated by the IDEA.

---

[1] Citations to the certified administrative record are denoted "R. __." *See* Dkt. No. 19.

In 2022, when J.M. was eleven years old, the DOE conducted a reevaluation of J.M. when he applied to a specialized autism program within the DOE (the "2022 Reevaluation"). R. 204. The school psychologist's report explained that the reevaluation was conducted "to gain a better understanding of his cognitive and academic functioning." R. 196. The evaluation consisted of a classroom observation, a psychoeducational assessment, and a social history update. R. 182. After it was completed, Plaintiff "disagree[d] with this reevaluation because it did not comprehensively evaluate [J.M.] in all his areas of need." R. 77. On January 3, 2024, Plaintiff therefore requested "that the DOE fund an independent education evaluation" of J.M., which would include a neurophysiological evaluation, a speech-language evaluation, an assistive technology evaluation, an occupational therapy evaluation, a physical therapy evaluation, an ABA skills assessment, and a functional behavior assessment. R. 77–78.[2]

DOE responded to Plaintiff's letter on February 1, 2024, and noted that it was "declining to grant the parent's request for an [IEE] at public expense and intends to file a Due Process Complaint to defend the 2022 DOE evaluation of the student." R. 186. It explained that it "declined to grant the requested [IEE] at public expense because it believes its evaluation of the student was comprehensive and assessed the student in all areas of suspected need." *Id.*[3] It continued that "[b]ased on the parent's stated concerns, the DOE also proposes conducting a reevaluation of" J.M. *Id.* The reevaluation would not include Plaintiff's requested evaluations.

---

[2] There is no evidence in the record as to why Plaintiff expressed disagreement in early 2024 after the IEE was completed in early 2022. The statute and regulations do not provide a time limit within which a disagreement with an IEE must be noticed.

[3] The regulations clarify only that the school must respond to the Plaintiff's request for an IEE "without unnecessary delay." 8 NYCRR § 200.5(g).

R. 221.[4]  Plaintiff did not give her consent to have J.M. reevaluated as suggested by DOE.  R. 207.

On February 15, 2024, DOE filed a due process complaint to defend the 2022 Reevaluation.  R. 181–84.  Both Plaintiff and Defendant entered exhibits into the record.  The DOE entered seven documents into evidence: (1) the DOE's own due process complaint, (2) the response DOE sent to Plaintiff after she requested the IEE, (3–5) the three reports that made up the 2022 Reevaluation, (6) the form indicating that Plaintiff did not consent to the DOE's proposed reevaluation, and (7) a testimonial affidavit of the DOE's sole witness, school psychologist Marina Bakoom ("Bakoom").  R. 248–51.  Bakoom was the DOE's sole live witness.  Plaintiff entered five exhibits, including (1) her letter requesting the IEE, (2) the accompanying rate sheets, (3) a neuropsychological exam conducted in April 2020, (4) J.M.'s 2020 IEP, and (5) J.M.'s 2022 IEP.  R. 253.  An impartial hearing was held before IHO Tala L. Nazareno on May 6, 2024.  R. 9.  The IHO issued its Findings of Fact and Decision ("FOFD") on May 30, 2024, finding that the DOE's 2022 Reevaluation of J.M. was appropriate.  R. 30. The IHO first concluded that DOE followed the necessary and appropriate procedures both in conducting the IEE and subsequently initiating the hearing by due process complaint upon Plaintiff's disagreement.  R. 26–27.  The IHO next rejected DOE's argument that because Plaintiff did not consent to its suggested reevaluation, Plaintiff was equitably barred from seeking a publicly funded IEE.  See R. 27 ("[T]here is no such requirement that after a Parent disagrees with a DOE evaluation that she must then consent to another evaluation conducted by the DOE before requesting an IEE.").  Finally, the IHO determined that the 2022 Reevaluation

---

[4] In addition to the classroom observation, social history update, and psychoeducational evaluation, DOE suggested adding a vocational assessment for the student and a vocational interview assessment for the parent.  R. 187.

was appropriate, as "the fact that the DOE did not conduct particular types of standardized testing is not error assuming that the DOE already had the information it needed to establish Student's needs." R. 29.  In the Student's 2022 IEP, "none of the related service providers recommended any modifications to the Student's services, nor recommended a new evaluation or assessment due to a newly observed behavior." *Id.*  Because the evaluation was a reevaluation, the IHO concluded that DOE did not need to include evaluations in areas that "would have little additional value in developing the Student's new IEP." R. 30.

Plaintiff appealed the IHO decision.  The appeal was assigned to SRO Carol Hague, who issued an order upholding the IHO's decision on September 13, 2024.  R. 18.  Plaintiff raised the same arguments pressed before the IHO and added too that the IHO erred by finding the testimony of the school psychologist credible.  R. 9–10.  The SRO found "no reason to disturb the IHO's findings that the district's 2022 reevaluation of the student was appropriate." R. 17.  "[T]he district was not required to show that it had exhaustively performed every assessment that the parent could point to in order to prevail," and the IEE provided was "appropriate and comprehensive." R. 17.  "Although it is understandable that the parent might generally desire further information about the student, I note that the parent still has the right to obtain an IEE, and ask the CSE to consider it, but not at public expense." R. 17.  Additionally, the SRO "disagree[d] with the parent's contention that the IHO erred in relying on the school psychologist's testimony," because (1) any "inconsistencies" in the psychologist's affidavit "were properly evaluated by the IHO in the context of her complete testimony and the evidence in the hearing record overall," and (2) the IHO did not give undue weight to the psychologist's testimony.  R. 18.

**PROCEDURAL HISTORY**

Plaintiff initiated this lawsuit by complaint on January 10, 2025.  Dkt. No. 1.  Plaintiff moved for summary judgment on June 5, 2025.  Dkt. No. 12.  Defendant submitted its own motion for summary judgment on November 4, 2025.  Dkt. No. 25.  Plaintiff submitted a reply to Defendant's motion on November 20, Dkt. No. 28, and Defendant submitted a reply to Plaintiff's motion on December 11, Dkt. No. 29.

**LEGAL STANDARD**

"Although the parties have styled their submissions as motions for summary judgment, 'the procedure is in substance an appeal from an administrative determination, not a summary judgment.'"  *C.U. v. N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).  As such, adjudicating an IDEA case at summary judgment "involves more than looking into disputed issues of fact; rather it is a pragmatic procedural mechanism for reviewing administrative decisions."  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012).  To that end, the Court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence."  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *see* 20 U.S.C. § 1415(i)(2)(C)(i)–(iii).  "The standard of review 'requires a more critical appraisal of the agency's determination than clear-error review but nevertheless falls well short of complete *de novo* review.'"  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (quoting *M.H.*, 685 F.3d at 244).

In conducting that review, the Courts "defer to the administrative decision because 'the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)).  "Deference is particularly

9

appropriate when the state officer's review 'has been thorough and careful,' but still we do not 'simply rubber stamp administrative decisions.'" *Id.* (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)). "The level of deference granted to the administrative decision . . . is not without limitation." *L.O. v. NYC Dep't of Educ.*, 822 F.3d 95, 109 (2d Cir. 2016). "To merit deference, '[t]he SRO's or IHO's factual findings must be 'reasoned and supported by the record.'" *Id.* (quoting *M.H.*, 685 F.3d at 241); *A.M. v. NYC Dep't of Educ.*, 845 F.3d 523, 534 (2d Cir. 2017). The reviewing court should reject the SRO's conclusions "if it finds they are not supported by a preponderance of the evidence." *W.A. v. Hendrick Hudson Central Sch. Dist.*, 927 F.3d 126, 149 (2d Cir. 2019).

## DISCUSSION

Plaintiff argues that the evaluation completed for J.M. in 2022 was legally insufficient and that the IHO and SRO opinions rejecting that same argument were therefore incorrectly decided. The Court has independently reviewed the administrative record. Remaining "mindful, of course, that how best to educate an autistic child is 'a difficult question of educational policy' that requires deference to the decisions of administrative experts," *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir.2009) (quoting *Gagliardo*, 489 F.3d at 113), there is insufficient support in the record to uphold the decisions of the state administrators.

The parties agree that the reevaluation at issue, conducted in 2022, was not the first evaluation done for J.M. The Student's 2020 IEP clarifies that in January of 2020, J.M. received the following evaluations: speech and language, neuropsychological, functional behavior, physical therapy, and occupational therapy. R. 112–16. The IEP therefore recommended that the Student receive counseling services, occupational therapy, parent counseling and training, physical therapy, speech-language therapy, and the provision of a paraprofessional for behavioral

10

support. R. 133–34. In 2022, several new examinations were conducted "as part of a re-evaluation for [J.M.'s] application" to a specialized school program for students with autism (the "ASD program"). R. 204.[5] J.M. had been accepted into the program the year before, but Plaintiff decided to wait and apply again for the transition to middle school in sixth grade. *Id.* As explained, that evaluation from January to February 2022 included a psychoeducational evaluation, a social history update, and a classroom observation. R. 195–206. The social history update notes that J.M., at that point, continued to receive adaptive physical education, counseling, occupational therapy, physical therapy, and speech therapy, and that he continued to work 1:1 with a behavior support paraprofessional. R. 204.

The record before this Court, and the state administrators, also contains J.M.'s 2022 IEP, although that was not executed until several months after the 2022 Reevaluation. That IEP noted that as of May 2022, J.M. was receiving speech and language therapy three times a week, R. 146, counseling twice a week, R. 147, physical therapy twice a week, R. 148, and occupational therapy twice a week, R. 149; *see also* R. 171–72 (listing Student's "special education programs and services" including counseling, occupational therapy, parent counseling and training, physical therapy, speech-language therapy, and a paraprofessional for behavior support daily).

---

[5] Plaintiff argues before this Court that there is no evidence supporting the IHO's finding that the reevaluation was conducted at the request of Plaintiff for Student's application to the ASD program. Dkt. No. 13 at 12. At the due process hearing, the school psychologist testified that the evaluation was done at the behest of Plaintiff upon application to that program, and that DOE therefore conducted only "the assessments that need to be done to be considered for the program." R. 322; *see* R. 323 (the evaluation was "tailored to the referral question, for the referral for the ASD program"). Plaintiff argues that the record supports instead that the reevaluation was a triennial reevaluation as required by statute, unless waived. Whereas the IHO's finding has support in the record, both from the school psychologist, R. 322–23, and from the social history report, R. 204, Plaintiff's argument has no support. To the contrary, the 2020 IEP indicates that the most recent evaluation was conducted in early 2020 (making a triannual evaluation necessary not in early 2022, but early 2023). R. 112–16.

The CSE that convened to create that IEP included J.M.'s Related Service Provider/Special Education Teacher, his General Education Teacher, Plaintiff, a district representative, social worker, speech therapist, occupational therapist, guidance counselor, school psychologist, and counselor.  R. 179.

Plaintiff argues that the January 2022 Reevaluation was inappropriate because it did not test Student's expressive or pragmatic language, fine motor skills, sensory processing needs, gross motor functioning, functional behavior, speech, occupational needs, physical needs, or need for ABA.  The IHO determined that such testing was not necessary for the reevaluation conducted, as "the IDEA and its implementing regulations do not require the District to perform anew the full scope of testing properly included in a child's initial evaluation."  R. 29 (quoting *Robert B. ex rel. Bruce B. v. W. Chester Area Sch. Dist.*, 2005 WL 2396968, at *5 (E. D. Pa. Sept. 27, 2005)).  The IHO relied on the 2022 IEP to find that "none of the related services providers recommended any modifications to Student's services, nor recommended a new evaluation or assessment due to a newly observed behavior."  R. 29.  She continued that "[f]urthermore, the 2022 IEP indicated that Student responded well to his behavior management system and to sensory breaks . . . and there is no indication that Student lacks functional writing skills necessitating the use of an [assistive technology]."  *Id.*  Because reevaluations "are typically done to determine whether a student qualifies for a particular service, or when a student demonstrates a completely new behavior that was not previously observed," she concluded that a new evaluation was therefore not necessary for those areas for which J.M. already received services and was progressing.  *Id.*  Such a reevaluation "would have had little additional value in developing Student's new IEP."  R. 30.

On review, the SRO confirmed those findings, again relying on the "May 2022 IEP" in concluding that "[t]he district's evaluation was sufficiently comprehensive, and additional information was not required in order to develop an appropriate IEP."  R. 17.  He determined that the evidence was sufficient to show that the reevaluation "included several assessments and strategies to gather relevant functional, developmental and academic information about the student," even if the parent "might generally desire further information."  *Id.*

The parties seemingly agree that in conducting a reevaluation, the district is not necessarily required to offer the same examinations that might be offered in a comprehensive initial evaluation.  The district is required instead to "review existing evaluation data on the student, including evaluations and information provided by the parents of the student, current classroom-based assessments, local or State assessments, classroom based observations, and observations by teachers and related services providers," and "[o]n the basis of that review, "identify what additional data, if any, are needed to determine . . . whether any additions or modifications to the special education services are needed to enable the student to meet the measurable annual goals set out in the IEP."  *Id.* § 200.4(b)(5)(i)–(ii).  Thus, "the IDEA only requires that additional assessments 'be conducted if found necessary to fill in gaps in the initial review of existing evaluation data.'"  *Thomason v. Porter*, 2023 WL 1966207, at \*13 (S.D.N.Y. Feb. 13, 2023) (quoting *S.F. v. N.Y.C. Dep't of Educ.*, 2011 WL 5419847, at \*10 (S.D.N.Y. Nov. 9, 2011)); *see* 20 U.S.C. § 1414(c)(2); *Z.B. v. District of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018) ("To be sure, [an evaluation under the IDEA] evaluation does not always require a school to conduct additional testing.").

Plaintiff maintains that although a district may look to existing data in conducting a reevaluation, it was inappropriate for the state administrators to consider data and observations

13

arising from the 2022 IEP because it post-dated the reevaluation, and there is otherwise insufficient data here to justify the circumscribed reevaluation conducted in 2022.  Plaintiff is correct on both fronts.

On the first, the law is clear that the district can consider only "existing evaluation data" in making its determination as to the appropriate scope of an IEE.  8 NYCRR § 200.4(b)(5)(i). Per the record before the Court, the only data that would have been accessible to the district decisionmakers in determining the scope of J.M.'s early 2022 Reevaluation were any reports that occurred before that date, including the 2020 IEP.  It could not have included the 2022 IEP, which was not developed until months after that decision.  To permit an IEP developed after an IEE to retrospectively clarify the scope of the IEE would undermine the purpose of that evaluation.  "The evaluation requirement 'serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child.'"  *Z.B.*, 888 F.3d at 523 (quoting *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016)); *see Schaffer*, 546 U.S. at 61 (explaining that "[p]rior to" a hearing on an IEP, "the parties must disclose the evaluations and recommendations that they intend to rely on.").  "The child's IEP team takes the results of these evaluations and regulatory collaborates to develop, maintain, and update the child's IEP over the course of their education." *D.S.*, 975 F.3d at 157.  If the purpose of an IEE is in part to level the playing field between the parent and the school district in the development of the IEP, the limited scope of the IEE cannot be justified on the basis of the contents of the subsequent IEP.  Indeed, the DOE itself argued that the 2022 IEP should not be admitted into evidence, arguing that it was not relevant in determining whether the 2022 Reevaluation was appropriate.  R. 253–54.

14

The remaining evidence in the record before the IHO and SRO is insufficient to justify their conclusion that the IEE was adequate.  At the due process hearing, it was DOE's burden to demonstrate the adequacy of the IEE.  *D.S.*, 975 F.3d at 168; *see* N.Y. Educ. L. § 4404(c) ("[T]he school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof . . . in any such impartial hearing, except that a parent . . . seeking tuition reimbursement for a unilateral parental placement shall have the burden . . . on the appropriateness of such placement.").  To show that J.M. required only a psychoeducational evaluation, classroom observation, and social history update, it was therefore incumbent on the DOE to demonstrate what "existing data" or prior evaluations it looked to in determining that only those three elements were necessary to "assist in determining . . . the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum."  20 U.S.C. § 1414(b)(2)(A)(ii).  The record contains no evidence whatsoever about which individuals, if any, convened to discuss what evaluations would be necessary for J.M..  The regulations clarify that the review should be conducted by "the IEP Team and other qualified professionals."  34 C.F.R. § 300.305(a).  Nor is there any evidence in the record concerning what existing data or evaluations those unknown individuals relied on in determining the scope of the reevaluation, or how that existing data informed their decision to conduct the reevaluation that was ultimately executed.

The IHO's conclusion to the contrary that there was "no evidence in the record to suggest" that the Plaintiff's concerns were present, R. 29, reversed the burden of proof—it was not on Plaintiff to prove by a preponderance that each requested evaluation was necessary, but rather on DOE to show by a preponderance that no such reevaluation was necessary based on

15

existing data.  Similarly, the SRO's conclusion that the "district was not required to show that it had exhaustively performed every assessment that the parent could point to in order to prevail," R. 17, is beside the point.  It is uncontested that, if the district had relied on existing assessments to reach its conclusion that further evaluations were not necessary, it would not be required by law to conduct such an evaluation.  Put differently, it is true that the DOE does not have to show it performed every possible desired assessment to prevail—it just needs to show by a preponderance of the evidence that it had a reason, based in the existing information it had on that student, not to perform the requested evaluations.  That is the DOE's burden at the due process hearing.  *See E.A.M. v. NYC Dep't of Educ.*, 2012 WL 4571794, at *6 ("New York law allocates the burden of persuasion and production to the school district in an impartial hearing." (citing N.Y. Educ. L. § 4404(1)(c))).

Given the lack of evidence presented by the DOE, the IHO and SRO relied primarily on the 2022 IEP and testimony provided by a school psychologist at the due process hearing.  As explained, the 2022 IEP was not evidence that they could consider in evaluating whether the earlier IEE was appropriate.  And even if that IEP had been conducted prior to the IEE, the DOE would need to have set forth some evidence explaining which persons considered that IEP, what conclusions they drew as a result, and how that informed their decisionmaking as to what evaluations to conduct in a subsequent reevaluation.

Nor was the school psychologist's testimony alone sufficient for the DOE to meet its burden.  The psychologist who testified at the due process hearing neither conducted any portion of the 2022 Reevaluation at issue nor attended J.M.'s prior IEP meetings—she could not testify as to what the actual decisionmakers considered, or how they made their determination.  Her knowledge was based only on "reading his evaluations," as she did know "know" J.M.  R. 278.

16

In preparation for her testimony, the psychologist read the psychoeducational evaluation, classroom observation, and social history done in 2022. *Id.* She also noted that she was "familiar with" the psychologist who did the psychoeducational evaluation and the tools she used to conduct the evaluation. R. 278–79. It is notable too that her testimony was based on *only* the 2022 IEP, not the earlier (and relevant) 2020 IEP. R. 301–03.

The psychologist's testimony focused on the general procedures at the DOE. For example, the psychologist explained that if a student was already receiving a listed service, "usually the service provider" would "provide a progress report about how he's doing and update the goals to match his current needs," such that "[t]here doesn't necessarily need to be a new physical therapy assessment if he's currently receiving physical therapy." R. 290. So "if [the student] had OT, speech, and PT then that would mean those providers contributed to the IEP meeting and contributed to the goals and the data about how . . . he was doing during that year. So if those things were done, then, yes, I think its an appropriate assessment." R. 301. That testimony does not advance the DOE's case. It clarifies only that *if* the described analysis had in fact occurred at the IEP meeting, then that would have been sufficient. But it does not establish what did occur at the meeting to consider the scope of the reevaluation. Without any personal knowledge or even information conveyed by a person with personal knowledge, the psychologist could not testify as to the specific data that informed the decision to conduct only the psychoeducational evaluation, classroom observation, and social history for J.M.[6] Based on that

---

[6] There are other indicia that the school psychologist was enlisted only at the eleventh hour to provide evidence at the due process hearing. Her affidavit was submitted late, R. 239, and referred to J.M. as "her" (J.M. is male), and contains a paragraph that states only: "What other assessments or evaluations were performed to ascertain the physical, mental, behavioral, and emotional factors which contribute to the suspected disabilities," R. 209. The SRO found that language to be merely "lacking in clarity." R. 18. It is clear to this Court that the language reflects a question that the psychologist was meant to answer in the affidavit, but accidentally left

testimony, one could imagine that (1) a committee convened to determine what reevaluation to conduct for J.M., (2) that committee consulted with J.M.'s service providers and determined that the a reevaluation would be focused on only those skills necessary for the program for which J.M. had applied, (3) the committee looked also to the data and observations contained in his 2020 IEP, and (4) that it concluded that only the tests ultimately conducted were necessary.  That might even be what happened in this case.  However, there is simply no evidence supporting that theory other than the mere conjecture of a witness with no actual knowledge.  Absent such evidence, the conclusions of the IHO and SRO are not supported by a preponderance of the evidence and must be reversed.

The relief that Plaintiff seeks is limited.  Plaintiff requests only that J.M. receive an IEE funded at the public expense.  The DOE initiated the due process proceeding to justify the validity of the IEE conducted for J.M.  A party "aggrieved by the findings and decisions" made by state administrators "shall have the right to bring a civil action."  20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(a), (d).  The Court may then "grant such relief as the court deems appropriate."  20 U.S.C. § 1415(i)(2).  Plaintiff has not challenged the validity of J.M.'s 2022 IEP or alleged that J.M. was denied a FAPE on the basis thereof.  *See Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 325 (D. Conn. Nov. 30, 2016) ("[T]he determination of which party is obligated to pay for an IEE—a parent or the board of education—is distinct from and irrelevant to deciding the merits of the underlying issue of appropriate student placement.").

Plaintiff seeks funding for: (1) a neuropsychological evaluation at a rate of $6,000; (2) a speech-language evaluation at a rate of $2,500; (3) an assistive technology evaluation at a rate of

---

in as-is.  In her testimony, the psychologist insisted that it "was written because I meant to say, like, like, an accumulation of the data."  R. 299.  Even with deference to the state administrators that were closer to the evidence, that is not a credible answer.

$3,000; (4) an occupational therapy evaluation at a rate of $2,500; (5) a physical therapy evaluation at a rate of $2,500; (6) an ABA skills assessment at a rate of $4,125; and (7) a functional behavior assessment at a rate of $4,125.  R. 77–78; *see also* R. 79–82.[7]  A reevaluation is required in "all areas of suspected disability," 20 U.S.C. § 1414(b)(3)(B), and J.M.'s 2020 IEP provided a sufficient basis for Plaintiff to seek the evaluations requested. Almost all of the evaluations requested were conducted in January 2020 and resulted in the provision of related services.  That is a sound basis for concluding that J.M. has a "suspected disability" that the agency would be required to investigate.  *See* R. 30 (J.M. has "clearly established needs in certain areas, such as [speech language therapy], [occupational therapy], [physical therapy], counseling, and his behavior intervention plan.").  The only test that was seemingly not conducted in advance of the 2020 IEP was an assistive technology evaluation. The IHO rejected the need for that test on the basis that "uses of devices such as an IPAD are currently used as a reward for J.M."  R. 29.  However, Plaintiff argues that the evaluation is "warranted to determine whether technology can assist J.M. with accessing his curriculum given his academic and executive functioning deficits, especially in light of the District's determination that he already benefits from low-tech accommodations in the form of thick pencils and adaptive seat cushions."  Dkt. No. 13 at 23 (citing R. 150).  More importantly, there is no evidence in the record that the decisionmakers evaluated J.M.'s iPad use in determining whether he could benefit from additional technological services in the first instance.

DOE was provided, by law, with the chance to rebut the presumption that such a reevaluation is necessary or to argue that only a subset of the requested evaluations were

---

[7] At no point has the DOE disputed these costs, which were provided in Plaintiff's initial letter expressing disagreement with the IEE.  R. 79–82.

necessary, so long as that decision was based on existing data or observations.  But the Court has determined that the DOE failed to meet its burden to show at the due process hearing that "its evaluation [wa]s appropriate."  34 C.F.R. § 300.502(b)(2).  DOE is required to "[e]nsure that an [IEE] is provided at the public expense."  *Id.*  Plaintiff is therefore entitled to an IEE that includes the tests listed at R. 77–78 at the public expense.

Plaintiff also requests attorneys' fees.  "In any action or proceeding brought under this section, the Court, in its discretion, may award reasonable attorneys' fees as a part of the costs to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1515(i)(3)(B)(i)(I).  Plaintiff, parent of J.M., has prevailed in the instant proceeding and is entitled to attorneys' fees.  By March 18, 2026, Plaintiff shall submit materials in support of the request for fees.  *See N.Y. Ass'n of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  Defendant shall file any objections by March 23, after which the Court will enter a final judgment.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED, and Defendant's motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to close Dkt. Nos. 12 and 25.

SO ORDERED.

Dated: March 6, 2026
      New York, New York

                         LEWIS J. LIMAN
                     United States District Judge